1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
      Claude M. Stern (Bar No. 96737)
2      claudestern@quinnemanuel.com
      Evette Pennypacker (Bar No. 203515)
3      evettepennypacker@quinnemanuel.com
      Michael F. LaFond (Bar No. 303131)
4      michaellafond@quinnemanuel.com
      Sydney P. Archant (Bar No. 308826)
5      sydneyarchant@quinnemanuel.com
      555 Twin Dolphin Drive, 5th Floor
6      Redwood Shores, California  94065
    Telephone:     (650) 801-5000
7   Facsimile:      (650) 801-5100

8   QUINN EMANUEL URQUHART & SULLIVAN, LLP
      Kenneth K. Suh (Bar No. 283591)
9      kennethsuh@quinnemanuel.com
    500 W. Madison, Suite 2450
10  Chicago, IL 60661
    Telephone: (312) 832-4564
11
12  Attorneys for Defendants Yan Li, Hua Zhong, Da
    Huo, and Zhenzhen Kou

13

14                  **UNITED STATES DISTRICT COURT**

15                  **NORTHERN DISTRICT OF CALIFORNIA**

16

17  UCAR TECHNOLOGY  (USA) INC., a            CASE NO. 5:17-cv-01704
    California corporation, and UCAR INC., a
18  Chinese corporation,

19                  Plaintiff,                **DEFENDANTS' JOINT OPPOSITION TO
                                              MARCH 29, 2017 ORDER TO SHOW
20          vs.                               CAUSE**

                                              Date: April 12, 2107
21  YAN LI, an individual; HUA ZHONG, an      Time: 01:00 pm
    individual; DA HUO, an individual; and    Courtroom: 4
22  ZHENZHEN KOU, an individual,

23                  Defendants.

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    LEGAL STANDARDS ................................................................................... 2

II.   BRIEF STATEMENT OF FACTS .............................................................. 2

     A.    The Parties ........................................................................................ 2

     B.    Defendants' Employment With UCAR ......................................... 4

     C.    Defendants Resign From UCAR and Take No UCAR Information ........................ 5

     D.    Defendants Are and Will Continue to be Harmed by Injunctive Relief ................. 6

III.  PUBLIC INTEREST DISFAVORS GRANTING A PRELIMINARY INJUNCTION .................................................................................................. 7

IV.  UCAR HAS FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS: IF ANYTHING THERE IS A COMPLETE FAILURE OF PROOF ON ALL CLAIMS ................................................................................................. 9

     A.    UCAR's UTSA/Federal Trade Secret Claims Are Likely to Fail .......................... 9

          1.    UCAR Improperly Lumps All Defendants Together ................................... 9

          2.    UCAR Fails to Identify Any Trade Secrets ................................... 9

          3.    UCAR Fails to Sufficently Allege that it Owns Any Trade Secrets .......... 10

          4.    UCAR's Conclusory Allegations Fail to Support Injunctive Relief .......... 10

          5.    UCAR's Inevitable Disclosure Theory Has Long Been Rejected ............. 11

          6.    UCAR Failed to Protect its "Trade Secrets" ................................... 12

               (a)    UCAR Did Not Identify Its Materials As Proprietary Or Confidential ........................... 13

               (b)    There Was Unobstructed Physical Access To UCAR's Office ....... 13

               (c)    UCAR's Business Practices Did Not Protect Its AWS Server ........ 13

               (d)    UCAR's Employees Are Not Subject To Confidentiality, Non-Disclosure, Or Assignment of Rights Agreements ................. 14

          7.    UCAR Fails To Identify Any Actual Misappropriation............................. 15

               (a)    UCAR's Complete Failure of Proof ................................... 15

               (b)    Mere Possession Is Not Misappropriation ................................... 16

B.    UCAR Has Failed to Show It Is Likely to Succeed In Its Contract Claim .............. 17

C.    UCAR Has Failed to Show It Is Likely to Succeed In Its Property Claim ............. 18

D.    UCAR Has Failed to Show It Is Likely to Succeed In Its Fraud Claim.................. 18

E.    UCAR's Unfair Competition Claims Have Been Pre-empted And Must Fail ........ 20

V.    THERE IS NO DANGER OF IRREPARABLE HARM....................................... 21

A.    UCAR Relies on Outdated Law for an Impermissible Presumption of "Irreparable Injury." ...................................................................... 21

B.    UCAR Has Completely Failed to Demonstrate "Irreparable Injury.".................... 22

C.    Any Claimed Injury is Moot. ...................................................... 22

VI.    DEFENDANTS WOULD SUFFER GREATER HARDSHIP............................. 23

VII.    UCAR HAS NO BASIS TO SEEK EXPEDITED DISCOVERY .................................... 24

VIII.    ANY PI MUST BE SECURED BY A SUBSTANTIAL BOND ...................................... 25

IX.    CONCLUSION ................................................................................... 25

DEFENDANTS' JOINT OPPOSITION TO MARCH 29, 2017 ORDER TO SHOW CAUSE

1

## **<u>TABLE OF AUTHORITIES</u>**

2

**Page**

3

### **<u>Cases</u>**

4

*Action Learning Sys., Inc. v. Crowe,*
    2014 WL 12564011 (C.D. Cal. Aug. 11, 2014) ....................................................8

5

6

*Advanced Modular Sputtering, Inc. v. Superior Court,*
    132 Cal. APP. 4th 826 (2005) ..............................................................................25

7

*Agency Sols.Com, LLC v. TriZetto Grp., Inc.,*
    819 F. Supp. 2d 1001 (E.D. Cal. 2011) ...............................................................24

8

9

*Alliance,*
    632 F.3d at 1131 (9th Cir. 2011) .........................................................................22

10

*Allied N. Am. Ins. Brokerage Corp. of California v. Woodruff-Sawyer,*
    2005 WL 6583937 (N.D. Cal. Feb. 22, 2005) ......................................................21

11

12

*Am. Red Cross v. Palm Beach Blood Bank, Inc.,*
    143 F.3d 1407 (11th Cir. 1998) ............................................................................8

13

*Applied Materials, Inc. v. Advanced Micro-Fabrication Equp. (Shanghai) Co.,*
    2008 WL 183520 (N.D. Cal. Jan. 18, 2008) ........................................................24

14

15

*Areas USA SJC, LLC v. Mission San Jose Airport, LLC,*
    2012 WL 1831576 (N.D. Cal. May 18, 2012) ......................................................17

16

*Be In, Inc. v. Google Inc.,*
    2013 WL 5568706 (N.D. Cal. Oct. 9, 2013) ........................................................16

17

18

*Bridal Expo, Inc. v. van Florestein,*
    2009 WL 255862 (S.D. Tex. Feb. 3, 2009) ..........................................................20

19

*CBS Interactive v. Etilize, Inc.,*
    2009 Cal. Super. LEXIS 2262 (L.A. County Super. Dec. 10, 2009) ....................25

20

21

*Comp. Econ., Inc. v. Gartner Grp., Inc.,*
    50 F. Supp. 2d 980 (S.D.Cal. May 25, 1999) .......................................................24

22

*Continental Car-Na-Var Corp. v. Moseley,*
    24 Cal. 2d 104 (1944) ............................................................................................1

23

24

*Cornewell v. Belton,*
    No. 3:04-cv-00658-H-BLM (N.D. Cal. Sept. 9, 2005) .........................................14

25

*Cornwell v. Belton,*
    245 F. App'x 592 (9th Cir. 2007) .........................................................................14

26

27

*Cuviello v. City of Oakland,*
    2009 WL 734676 (N.D. Cal. Mar. 19, 2009) .........................................................7

28

1    *CyberMedia, Inc. v. Symantec Corp.*,
2        19 F. Supp. 2d 1070 (N.D. Cal. 1998) ...............................................................25

3    *Cypress Semiconductor Corp. v. Maxim Integrated Prod., Inc.*,
         236 Cal. APP. 4th 243 (2015) ...........................................................................9

4    *Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC*,
5        369 F.3d 1197 (11th Cir. 2004) .......................................................................14

6    *eBay Inc. v. MercExchange, L.L.C* ......................................................................21

     *Faiveley Transp. Malmo AB v. Wabtec Corp.*,
7        559 F.3d 110 (2d Cir. 2009) .............................................................................21

8    *First Franklin Fin. Corp. v. Franklin First Fin., Ltd.*,
9        356 F. Supp. 2d 1048 (N.D. Cal. 2005) ..........................................................24

     *First Health Grp. v. Nat'l Prescription Adm'rs.*,
10       155 F. Supp. 2d 194 (M.D. Pa. 2001) .............................................................14

11   *Flexible Lifeline Systems, Inc. v. Precision Lift, Inc.*,
12       654 F.3d 989 (9th Cir. 2011)............................................................................21

13   *FLIR Sys., Inc. v. Parrish*,
         174 Cal. APP. 4th 1270 (2009) .............................................................16, 17, 25

14   *Funches v. McDaniel*,
15       2011 WL 1871304 (D. Nev. Mar. 31, 2011) ...................................................22

     *Gabriel Technologies Corp. v. Qualcomm Inc.*,
16       2012 WL 849167 (S.D. Cal. March 13, 2012) ................................................24

17   *Glow Indus., Inc. v. Lopez*,
18       252 F. Supp. 2d 962 (C.D. Cal. 2002)................................................................2

     *Gonzalez v. Wells Fargo Bank, N.A., ,*
19       2012 WL 3249499 (N.D. Cal. Aug. 7, 2012) .....................................................2

20   *GSI Tech., Inc. v. United Memories, Inc.*,
21       No. 5:13-cv-01081-PSG, Dkt. 20, 2013 WL 12172990 (Mar. 27, 2013) ..............7, 8, 21, 22

22   *Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.*,
         736 F.3d 1239 (9th Cir. 2013)..........................................................................22

23   *Humphreys & Assocs., Inc. v. Cressman*,
24       2015 WL 12698428 (C.D. Cal. Aug. 31, 2015) ..............................................12

25   *In re Dippin' Dots Patent Litig.*,
         249 F. Supp. 2d 1346 (N.D. Ga. 2003) ...........................................................14

26   *Jobscience, Inc. v. CVPartners, Inc.*,
27       2014 WL 1724763 (N.D. Cal. May 1, 2014) ...................................................24

     *Kerr v. Rose*,
28       216 Cal. App. 3d 1551 (Ct. App. 1990) ..........................................................19

DEFENDANTS' JOINT OPPOSITION TO MARCH 29, 2017 ORDER TO SHOW CAUSE

*Koninklijke Philips N.V. v. Elec-Tech Int'l Co.,*
    2015 WL 1289984 (N.D. Cal. Mar. 20, 2015) ..................................................19

*Lewis Galoob Toys v. Nintendo of Am., Inc.,*
    1991 WL 1164068 (N.D. Cal. Mar. 27, 1991) ..................................................25

*Lifeline Food Co. v. Gilman Cheese Corp.,*
    2015 WL 2357246 (N.D. Cal. May 15, 2015) ..................................................20

*Lilith Games (Shanghai) Co. v. UCool, Inc.,*
    2015 WL 5591612 (N.D. Cal. Sept. 23, 2015) ..................................................21

*Loop AI Labs Inc v. Gatti,*
    2015 WL 1090180 (N.D. Cal. Mar. 12, 2015) ..................................10, 11, 15

*M.R. v. Dreyfus,*
    697 F.3d 706 (9th Cir. 2012) ..................................................22

*Metro Traffic Control, Inc. v. Shadow Traffic Network,*
    22 Cal. APP. 4th 853 (1994) ..................................................7

*Momento, Inc. v. Seccion Amarilla USA,*
    2009 WL 1974798 (N.D. Cal. July 8, 2009) ..................................................25

*Moore v. The Regents of the Univ. of California,*
    51 Cal. 3d 120 (1990) ..................................................18

*N. Atl. Instruments, Inc. v. Haber,*
    188 F.3d 38 (2d Cir. 1999) ..................................................8

*NetApp, Inc. v. Nimble Storage, Inc.,*
    2015 WL 400251 (N.D. Cal. Jan. 29, 2015) ..................................................18

*Perez v. Silva,*
    2015 WL 6957464 (N.D. Cal. Nov. 11, 2015) ..................................................8

*Pollara v. Radiant Logistics Inc.,*
    2014 WL 12585781 (C.D. Cal. June 6, 2014) ..................................................7

*Sammartano v. First Judicial Dist. Ct.,*
    303 F.3d 959 (9th Cir. 2002) ..................................................9

*Soc. Apps, LLC v. Zynga, Inc.,*
    Case No.: 4:11-CV-04910 YGR, 2012 WL 2203063 (N.D. Cal. Jun. 14, 2012) ....................24

*Stella Sys., ,*
    2014 WL 5828315 ..................................................22

*Stella Sys., LLC v. Medeanalytics, Inc.,*
    2014 WL 11369767 (N.D. Cal. Sept. 26, 2014) ..................................2, 16, 22

*Sunbelt Rentals, Inc. v. Victor,*
    2014 WL 492364 (N.D. Cal. Feb. 5, 2014) ..................................................10

DEFENDANTS' JOINT OPPOSITION TO MARCH 29, 2017 ORDER TO SHOW CAUSE

*Teleflora, LLC v. Florists' Transworld Delivery, Inc.*,
    2004 WL 1844847 (N.D. Cal. Aug. 18, 2004) ...............................................................14

*TMX Funding, Inc. v. Impero Techs., Inc.*,
    2010 WL 1028254 (N.D. Cal. Mar. 18, 2010) ..............................................................21

*United States v. Nosal*,
    844 F.3d 1024 (9th Cir. 2016) .............................................................................19, 20

*VasoNova Inc. v. Grunwald*,
    2012 WL 4119970 (N.D. Cal. Sept. 18, 2012) ...........................................................9, 10

*Versata Software, Inc. v. Internet Brands, Inc.*,
    2012 WL 3075712 (E.D. Tex. July 30, 2012) .................................................................8

*Vesta Corp. v. Amdocs Mgmt. Ltd.*,
    147 F. Supp. 3d 1147 (D. Or. 2015) ............................................................................24

*W. Directories, Inc. v. Golden Guide Directories, Inc.*,
    2009 WL 1625945 (N.D. Cal. June 8, 2009) .............................................................21, 23

*Whyte v. Schlage Lock Co.*,
    101 Cal. APP. 4th 1443 (2002) ......................................................................1, 11, 12

*Winter v. National Resources Defense Council, Inc*,
    555 U.S. at 22 ...........................................................................................................1

## Statutes

18 U.S.C. § 1030(a)(4) ...........................................................................................................19

18 U.S.C. § 1836 ..............................................................................................................9, 11

Business & Professions Code § 16600 .................................................................................7

Cal. Civ. Proc. Code § 2019.210 ....................................................................................8, 24

Cal. Labor Code § 2860 ................................................................................................17, 18

Fed. R. Civ. P. 65(b)(1) ........................................................................................................2, 8

> Every individual possesses as a form of property, the right to pursue any calling, business, or profession he may choose. A former employee has the right to engage in a competitive business for himself and to enter into competition with his former employer, even for the business of those who had formerly been the customers of his former employer, provided that such competition is fairly and legally conducted. *Continental Car-Na-Var Corp. v. Moseley* 24 Cal.2d 104, 110 (1944).

Plaintiffs uCar Technology (USA) Inc. and UCAR Inc. (collectively "UCAR") appear to have missed the above fundamental principle of California law when they filed this vacuous Application for a Preliminary Injunction against individual California residents Yan Li, Hua Zhong, Da Huo, and Zhenzhen Kou and viciously disclosed it to the press in China and in the United States.   UCAR's Application is based on outdated law;[1] fails to identify a single trade secret it believes it owns; contains no **facts** to even suggest, much less support likelihood of success on the merits, that any of the Defendants misappropriated any UCAR information; fails to mention that no Defendant had any confidentiality or intellectual property agreement with UCAR; and has literally no proof—no declaration, no documents, not anything—to show that UCAR has suffered or will suffer irreparable harm should its Application be denied.  Nor could it:  the Defendants did not misappropriate and do not have UCAR proprietary information—period.

UCAR does not even allege that they did. Instead, UCAR's entire Application appears to be based on the allegation that Defendants did not deny accusations by UCAR during meetings that Defendants would **inevitably** have to use UCAR information if they left to work at a competing self-driving car company.  Not only is this false as a matter of fact – Defendants never suggested they would use UCAR proprietary information in their next job, and not all information related to self-driving cars is UCAR information—it has been wrong as a matter of law since at least 2002 when a California Appeals Court rejected the inevitable disclosure doctrine in *Whyte v. Schlage Lock Co.*, 101 Cal. APP. 4th 1443, 1462-63 (2002).  Defendants did not misappropriate and do not have UCAR proprietary information.  They are free to join a competing business and to use their substantial prior experience and knowledge to compete with UCAR.  Plaintiffs may not

---

[1]   Defendants reserve their right to seek relief from the Court for these apparently intentional misstatements of law and facts, as well as its failure to conduct a reasonable pre-suit investigation, including reasonable attorney fees and sanctions under Rule 11.

DEFENDANTS' JOINT OPPOSITION TO MARCH 29, 2017 ORDER TO SHOW CAUSE

1   like that, but it is the law.  The Application should be denied[23].

2   **I.      LEGAL STANDARDS**

3           UCAR does not and cannot meet the standard for a preliminary injunction.   "[T]he

4   issuance of preliminary injunction is an **extraordinary remedy** that may only be awarded upon a

5   **clear** showing that the plaintiff is entitled to such relief.  The proper legal standard for preliminary

6   injunctive relief requires a party to demonstrate (1) that he is likely to succeed on the merits, (2)

7   that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance

8   of equities tips in his favor, and (4) that an injunction is in the public interest."  *Gonzalez v. Wells*

9   *Fargo Bank, N.A.*, , 2012 WL 3249499, at *2 (N.D. Cal. Aug. 7, 2012) (emphasis added) (internal

10  citations and quotations omitted).   Alternatively, in this Circuit, a court may grant a preliminary

11  injunction if the movant proves there are "**serious** questions going to the merits and the balance of

12  hardships tips **sharply** in its favor…so long as the movant satisfied the other elements for

13  preliminary relief."  *Stella Sys., LLC v. Medeanalytics, Inc.*, 2014 WL 11369767, at *4 (N.D. Cal.

14  Sept. 26, 2014) (emphasis added).   "[A]lthough the Supreme Court invalidated the [Ninth

15  Circuit's] sliding scale approach, the 'serious questions' prong of the sliding scale survived so long

16  as the movant satisfied the other elements for preliminary relief."  *Id.* (citations omitted).  UCAR

17  has no evidence to meet either of these standards.

18  **II.     BRIEF STATEMENT OF FACTS**

19          **A.      The Parties**

20

---

21  [2]  UCAR's TRO should not have been granted because UCAR failed to comply with the
    requirements of Fed. R. Civ. P. 65(b)(1).  (*See* Dkt. 22).  UCAR's Application does not even argue
22  that it complied with the notice requirement of Rule 65(b)(1)(B).  (*Id.*).  Moreover, as explained in
    this Opposition, UCAR's only argument that it will suffer "immediate and irreparable injury, loss,
23  or damage," as required by Rule 65(b)(1)(A), is based on outdated law.

24  [3]  The time for Plaintiffs to present evidence to support their request for such extraordinary relief
    was when they made the application.  Plaintiffs should not be permitted to bring new evidence in
25  response to Defendants' opposition.  *Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 1005 n. 150
    (C.D. Cal. 2002).   ("At the preliminary injunction hearing, Glow, Inc.'s counsel requested an
26  opportunity to supplement the record, and provide additional evidence of the harm the company
    will suffer if an injunction does not issue. . . To permit plaintiff to supplement the record further at
27  this stage of the proceedings in order to correct deficiencies in the original showing would simply
    prejudice defendants further and reward plaintiff's questionable litigation strategy. This the court
28  declines to do so.").

---

Defendants are four highly educated engineers that live and work in Silicon Valley, and formerly worked for UCAR.  Li Decl. ¶1, 3-6, Zhong Decl. ¶1, 3-8, Huo Decl. ¶1, 3-7, and Kou Decl. ¶1, 3-10.  Yan Li has a PhD in electrical and computer engineering from Carnegie Mellon University and worked for Microsoft and Facebook before joining UCAR.  Li Decl. ¶3- 5.  Mr. Li's research has long focused on machine learning and object recognition, detection, and tracking, and he published several papers and was granted a patent in this area – all before he joined UCAR.  Li Decl. ¶7-12.    Mr. Zhong has a PhD in computer science from Carnegie Mellon.  Zhong Decl. ¶3    Before joining UCAR, Mr. Zhong worked for Spotlight Medical in Pittsburgh, Siemens, Google and Peekabuy – a start up focused on creating artificial intelligence to help consumers select clothing— and conducted research and published papers related to self-driving car technology.  Zhong Decl. ¶4-8.  Mr. Huo has a masters in computer science from the University of California at Irvine and worked at Peekabuy with Mr. Zhong before he joined UCAR.  Huo Decl. ¶3-6.    Like Mssrs. Li and Zhong, Mr. Hua's pre-UCAR research was relevant to self-driving cars and resulted in published material.  *Id*.   Ms. Kou has a PhD in machine learning from Carnegie Melon.  Kou Decl. ¶3  Before joining UCAR, Ms. Kou worked for the IBM Watson Research Center, developing prediction models for Netflix to use when recommending movies to consumers, Yahoo! labs, where she built predictive models based on user interests in order to improve user satisfaction and experience, ShareThis, Inc., where  she continued to develop techniques regarding how to target specific users based on their past behavior, Google, where she worked on developing an automatic speech recognition engine, and Uber Technologies where she worked on developing technology capable of analyzing GPS logs to improve service efficiency.  Kou Decl. ¶4-12.   None of the defendants has ever been accused of wrongdoing by an employer, much less sued.  Li Decl. ¶152; Zhong Decl. ¶110; Huo Decl. ¶75; Kou Decl. ¶80

UCAR operates a ride-hailing app in China.  App. at 2.  UCAR Technology (USA) Inc. was incorporated in 2015 to begin operations in the United States.  LaFond Decl. Ex. 2. Although technically a separate business entity, during Defendants' employment, UCAR Inc. (China) was in complete control of UCAR Technology (USA) Inc., including all budgetary and

1   management decisions.  Li Decl. ¶19-22, 27-40; ¶Zhong Decl. ¶30-34.  There were no Board

2   meetings or minutes of the Board meetings, and instructions and management decisions from

3   UCAR Inc. (China) were communicated to U.S.-based employees through Yihui Zhang, whose

4   official title was "office manager." *Id*.

5       **B.       Defendants' Employment With UCAR**

6       Of the Defendants, Yan Li was the first to begin working for UCAR, having accepted his

7   offer of employment in July of 2015.  *See* Dkt. 6-3 at Ex. 1.  After Mr. Li joined UCAR in July,

8   Ms. Kou joined in September, Mr. Zhong joined in November, and finally Mr. Huo joined in April

9   of 2016.  Li Decl. Ex. A; Zhong Decl. Ex. A; Kou Decl. Ex. A; Huo Decl. Ex. A.  Initially,

10  Messrs. Li and Zhong and Ms. Kou worked on a fraud detection feature for UCAR's ride hailing

11  app.  Kou Decl. at ¶17-21; Zhong Decl. at ¶25-29; and Li Decl. at ¶22-26.  This feature collected

12  information from vehicles operating in China to prevent fraudulent activity.  *Id*.  In 2016, Mr. Huo

13  joined UCAR and worked on an Android app.  Huo Decl. at ¶12-17.  Shortly thereafter, Messrs. Li

14  and Zhong and Ms. Kou began working on UCAR's self-driving vehicle project, while Mr. Huo

15  worked on various android app projects.  *Id*; Kou Decl. at ¶17-21; Zhong Decl. at ¶25-29; Li Decl.

16  at ¶22-26.

17      None of the Defendants was asked to sign a confidentiality or non-disclosure agreement

18  with UCAR.  Li Decl. at ¶41-50; Zhong Decl. at ¶35-44; Huo Decl. at ¶18-25; Kou Decl. at ¶22-

19  29.  UCAR had no formal onboarding process.  *Id*.  There were no instructions about any

20  company policies, including policies regarding computer use, data storage, confidentiality,

21  treatment or return of company information – nothing.  *Id*.  Nor was there was any employee

22  handbook or other documentation from which this information could otherwise be obtained.  Li

23  Decl. at ¶41-50; Zhong Decl. at ¶35-44; Huo Decl. at ¶18-25; Kou Decl. at ¶22-29.

24      In fact, at the time Mr. Li joined UCAR, it did not even have a form employment contract

25  for Mr. Li to sign.  Li Decl. at ¶17.  Instead, Mr. Li created his own employment letter by

26  modifying the letter he received from his prior employer, Facebook.  *Id*.  UCAR continued to use

27  the Facebook letter as a template when extending offers to the other Defendants.  *Compare* Li

28  Decl. Ex. F *with* Dkt. 6-3 at Exs. 1-4.

**C.   Defendants Resign From UCAR and Take No UCAR Information**

Defendants left UCAR because (1) UCAR failed to grant the stock options promised in their employment agreements and (2) UCAR's treatment of the employees during these negotiations. Li Decl. at ¶78-83, Zhong Decl. at ¶57-61, and Kou Decl. at ¶35-38. No Defendant took any UCAR proprietary information with them when they left; in fact, when they decided to resign from UCAR, each Defendant left their computers in their office on March 14.

UCAR makes much of Defendants' innocuous decision to format their UCAR issued laptops, implying wrongly that Defendants covertly deleted incriminating evidence. (*See, e.g.,* APP. at 6 ("The fact they deleted all the data from their laptops…is strong circumstantial evidence that they still have possession of that trade secret information."). First, nothing was destroyed because UCAR's technical materials on the laptops, including source code, was properly uploaded to UCAR's AWS account before those laptops were formatted. Li Decl. at ¶51-69, Zhong Decl. at ¶45-56, Huo Decl. at ¶26-30, and Kou Decl. at ¶30-34. Second, Defendants openly discussed formatting the laptops in the presence of Yihui Zhang, who represented UCAR Inc. (China) in the minds of the U.S.-based employees and initiated the formatting in his presence; Mr. Zhang did not object or protest. Li Decl. at ¶114-120, Zhong Decl. at ¶86-91, Huo Decl. at ¶48-58, and Kou Decl. at ¶61-62. Third, three of the four Defendants left the UCAR premises before the process was complete, while Ms. Kou formatted her hard drive before arriving for her last day. *Id*. They simply started the process using standard Macintosh pre-loaded software and left—taking nothing with them. *Id.* To Defendants' knowledge, this was common practice in Silicon Valley so that employees could delete personal information, such as browser history and family pictures, from company issued laptops. *Id*. Each Defendant did this before when leaving previous employers. *Id.*. And, this formatting was not a violation of any UCAR policy or guidelines. *Id*.; Li Decl. at ¶41-50; Zhong Decl. at ¶35-44; Huo Decl. at ¶18-25; Kou Decl. at ¶22-29. Indeed, Mr. Li, whose employment agreement with Facebook was the template for his agreement with UCAR, similarly formatted his hard drive when he left Facebook without any issue or objections. Li Decl. at ¶116. Defendants took no UCAR information or property with them when they left on March 14, and they have since searched their homes and returned everything they could find – including

1   computer wall mounts – that might have belonged to UCAR at one time.  Li Decl. at ¶141-148;

2   Zhong Decl. at ¶102-106; Huo Decl. at ¶68-71; Kou Decl. at ¶72-76.

3   UCAR's repeated allegation that its employees were completely locked out of the entire

4   contents of its AWS account because of Defendants' laptop formatting is just false.  *See, e.g.,* App.

5   at 6.  The only difference between any of the Defendants' access to UCAR's AWS account and any

6   other UCAR employee's access is Mr. Li's administrative rights to Phabricator, the code

7   depository located on AWS.  Li Decl. at ¶51-69.  Contrary to UCAR's representations, all of

8   UCAR's users continue to have the ability to download and upload files to Phabricator, and none

9   of the Defendants were able to then, and are not able to now, affect any other part of UCAR's

10  AWS account.  *Id.*  UCAR cannot plead ignorance of this fact.  Just last week, in response to an

11  inquiry from a China-based UCAR employee, Mr. Li clarified that all UCAR employees continue

12  to have full access to UCAR's AWS account and provided instructions for uploading and

13  downloading materials from Phabricator.  *Id.* at ¶141-144. Mr. Li suggested to this UCAR

14  employee that UCAR should create a new Phabricator sever so that UCAR can have complete

15  control of Phabricator.  *Id.*  A UCAR employee confirmed that UCAR completed this process and

16  none of the Defendants have any access to this server.  *Id.*

17  Plaintiffs' suggestion that Defendants admitted through silence that they planned to use or

18  would inevitably be using UCAR proprietary information at a new employer is also false.  Li

19  Decl. at ¶121-132; Zhong Decl. at ¶92-101; Huo Decl. at ¶59-67; Kou Decl. at ¶63-71. Other than

20  the two self-serving declarations, there is no evidence of this.  Nor is there any forensic or other

21  evidence in this record or elsewhere to suggest or support this accusation.  The competent

22  evidence before the Court definitively shows the Defendants did not misappropriate and do not

23  have UCAR information and thus did not and cannot misuse it for their new employer.

24  **D.      Defendants Are and Will Continue to be Harmed by Injunctive Relief**

25  UCAR has no evidence of harm, but Defendants are already suffering and will continue to

26  suffer harm if an injunction issues.  Defendants all joined JingChi, which is in its infancy and was

27  founded by Professor Tony Han, an Associate Professor in the Electrical and Computer

28  Engineering Department of the University of Missouri, whose research focuses on deep machine

1  learning and object detection in videos, including research that is used to detect people and avoid

2  collisions.  Han Decl. at ¶3-19.  Defendants did not conduct **any** JingChi business or research

3  using UCAR's resources.  Li Decl. at ¶88, Zhong Decl. at ¶63-64; 109, Huo Decl. at ¶32; Kou

4  Decl. at ¶42; Han Decl. ¶23.  And UCAR cites to no evidence that they did so.  APP. at 4.

5  ### III.  PUBLIC INTEREST DISFAVORS GRANTING A PRELIMINARY INJUNCTION

6      California's strong policy in favor of "'open competition and employee mobility,' [that]

7  protects the legal right of individuals to practice their business, profession or trade[]" prevents

8  UCAR from obtaining an injunction here.  *Pollara v. Radiant Logistics Inc*., 2014 WL 12585781,

9  at *1 (C.D. Cal. June 6, 2014) (quoting Business & Professions Code § 16600).  This public policy

10 is so strong that California courts routinely strike contract provisions that impede it even where the

11 contract calls for other law to apply.  *See Metro Traffic Control, Inc. v. Shadow Traffic Network,*

12 22 Cal. APP. 4th 853, 860 (1994).

13     UCAR contends it is nevertheless entitled to injunctive relief because "California courts

14 routinely recognize that public interest favors the protection of trade secrets" over the policy in

15 favor of employee mobility.  APP. at 11-12.  Even if true, UCAR ignores the requirement that the

16 <u>plaintiff has to identify some trade secret to protect</u>; UCAR has not done that here, so it cannot

17 demonstrate likelihood of success.  *GSI Tech., Inc. v. United Memories, Inc.*, No. 5:13-cv-01081-

18 PSG, Dkt. 20 at 12 (Mar. 27, 2013) ("Knowing that it cannot counter [the] 'strong public policy

19 [protecting employee mobility],' [the plaintiff] merely points to the public's interest in protecting

20 'trade secrets.'  Yet [the plaintiff] fails to identify a single one of its trade secrets that is not being

21 protected,]" as required by California law.).

22     An injunction conforming to UCAR's allegations would also improperly restrict each

23 Defendants' mobility, despite their superior knowledge and experience in the field compared to

24 UCAR.  Not only is the proposed injunction so broad that it would violate California's codified

25 public policy against restricting employee mobility, *see Metro Traffic Control,* 22 Cal. APP. 4th at

26 860 (striking a restrictive employment agreement as "unenforceable because it severely restricts

27 Metro's employees' mobility and betterment"), but it also includes undefined terms that render it

28 an impermissible "obey the law" injunction.  *See, e.g. Cuviello v. City of Oakland*, 2009 WL

734676, at *3 (N.D. Cal. Mar. 19, 2009) ("Under Rule 65[], an injunction must be more specific than a simple command that the defendant obey the law") (internal quotation omitted); *Perez v. Silva*, 2015 WL 6957464, at *7 (N.D. Cal. Nov. 11, 2015) (same).   Nonetheless, Plaintiffs' proposed injunction uses vague expansive terms, implicating the policy against "obey the law" injunctions.   *See, e.g. N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 50 (2d Cir. 1999) ("A defendant enjoined from using a 'trade secret' thus is confronted with an obey-the-law injunction. He does not know precisely what he is forbidden from doing."); *see also Versata Software, Inc. v. Internet Brands, Inc.*, 2012 WL 3075712, at *3 (E.D. Tex. July 30, 2012); *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1412 (11th Cir. 1998).

Courts also refuse to grant a preliminary injunction without a particularized list of the information that defendants are alleged to have misappropriated, as required by Cal. Civ. Proc. Code § 2019.210, which is plainly missing here.   As one court observed, it seems impossible "to see how a plaintiff can carry its heavy burden [for a preliminary injunction] under Rule 65 and *Winter* without specifying what, exactly, [the plaintiff] is trying to protect [and therefore,] the Court … could [not] possibly issue an order consistent with Rule 65(d)(1) without knowing what exactly the plaintiff owns." *Action Learning Sys., Inc. v. Crowe*, 2014 WL 12564011, at *4 (C.D. Cal. Aug. 11, 2014).   In *Action Learning,* the court refused to grant a preliminary injunction because descriptions like the ones UCAR provides, *e.g.,*"[d]etailed data [that it] collected[,]" "software and testing data[,]" and "software[,]" APP. at 5-6, "do nothing to clarify what [the plaintiff] claims it owns [or] are sufficiently-defined to even analyze. *Action Learning*, 2014 WL 12564011, at *5 (descriptions such "research-based strategy instruction," "data driven decision making," "models," "methodologies," and "algorithms" provide insufficient particularity to grant a preliminary injunction).

Public interest also disfavors an injunction because non-parties, such as Defendants' new employer, JingChi, would be harmed.   *GSI Tech.*, 2013 WL 12172990, at *11 ("Courts are hesitant to impose a preliminary injunction where it will harm the interests of the public or uninvolved third parties"). ████████████████████████████████████████████

████████████████████████████████████████ as will the California public which has

a significant interest in development of self-driving vehicle technology.  *Id.* at 12 ("The public has a substantial interest in the continued development of the DRAM market.").

The public's interest is also aligned with Defendants because UCAR's allegation relies heavily on law that is no longer operative in California.  For example, its trade secret allegations are based on the theory that there will be inevitable disclosure—a theory rejected by California Courts.  *See infra IV.A.5; see also Cypress Semiconductor Corp. v. Maxim Integrated Prod., Inc.*, 236 Cal. APP. 4th 243, 264 (2015) (rejecting trade secret misappropriation and related claims and awarding attorney's fees).  Likewise, UCAR incorrectly relies on cases reciting that there is a presumption of irreparable harm—law that was overturned more than **four** years ago.  *See infra V.* Issuance of a preliminary injunction based on such legal arguments, while beneficial for UCAR, would not serve the public's interest.  *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002) ("[t]he public interest inquiry primarily addresses [the] impact on non-parties rather than parties").  The Application should be denied.

## IV. UCAR HAS FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS: IF ANYTHING THERE IS A COMPLETE FAILURE OF PROOF ON ALL CLAIMS

### A. UCAR's UTSA/Federal Trade Secret Claims Are Likely to Fail

To succeed on its UTSA/FTS claim, UCAR must show: (1) it owned a trade secret; (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means; and (3) the defendant's actions damaged the plaintiff.  *VasoNova Inc. v. Grunwald*, 2012 WL 4119970, at * (N.D. Cal. Sept. 18, 2012); 18 U.S.C. § 1836(b)(1).   UCAR has not even remotely met these requirements as to each Defendant.

#### 1. UCAR Improperly Lumps All Defendants Together

For UCAR to succeed on the merits of any of its claims, it will have to show that each individual Defendant engaged in the alleged conduct – the Defendants are individuals, not a company.  UCAR has not done this for any of its claims, including its trade secret claims.  On that basis alone, its application for preliminary injunction should be denied.

#### 2. UCAR Fails to Identify Any Trade Secrets

Relatedly, UCAR fails to specifically identify any actual materials that is entitled to trade

secret protection.  UCAR only offers descriptions such as "[d]etailed data [that it] collected[,]" "software and testing data[,]" and "software[,]" APP. at 5-6, that courts have found insufficient to grant a preliminary injunction, as discussed in Section III, or even seek discovery, as discussed in Section VII.  *See also* Section VI (granting an injunction based on UCAR's descriptions would cause undue hardship for Defendants).

### 3.   UCAR Fails to Sufficently Allege that it Owns Any Trade Secrets

"[A] prima facie claim for misappropriation of trade secrets requires the plaintiff to demonstrate: (1) **the plaintiff *owned* a trade secret** ...." *VasoNova*, 2012 WL 4119970, at *3. (internal quotations and citations omitted) (emphasis in original).  UCAR Technology (USA), Inc. and UCAR Inc. are two distinct corporate entities.  But their Complaint fails to identify which entity claims ownership of the trade secrets, merely stating generically that "UCAR is the rightful owner of property, including computer data, trade secret and proprietary information…" (Dkt. 1 at ¶76).  UCAR's assertion that *some* plaintiff owns *some* trade secret does not demonstrate that either entity owned any particular trade secret.

### 4.   UCAR's Conclusory Allegations Fail to Support Injunctive Relief

UCAR's other arguments are also exactly the type of conclusory and unsupported allegations courts have found insufficient to carry the heavy burden of a preliminary injunction. *Sunbelt Rentals, Inc. v. Victor*, 2014 WL 492364, at *6 (N.D. Cal. Feb. 5, 2014).  In *Sunbelt¸* Judge Armstrong denied a preliminary injunction because the plaintiff merely stated that it "'invested substantial time, effort and expense to cultivate prospective and continuing relationships with its customers in the area within a 50–mile radius of [the Richmond rental center] and to develop customer goodwill by providing construction, industrial, and manufacturing equipment based on the particular needs of each customer at competitive prices.'" *Id.* Judge Armstrong noted that the plaintiff failed to present "**facts** …which specify the nature of the time, effort and expense that [the plaintiff] has purportedly expended to collect its customer information or to show that the information is neither generally known nor readily ascertainable. In the absence of such a showing, the Court is not persuaded, at least for purposes of the instant motion, that Sunbelt's customer lists are entitled to protection under the UTSA." *Id.* (emphasis added).

1    Similarly, in *Loop AI Labs,* Judge Gilliam denied an application for a TRO because "[the

2    plaintiff] has not demonstrated that (1) Defendant Gatti retains those 700 files; (2) Defendant Gatti

3    shared those files with any of the other Defendants; or that (3) the unspecified contents of those

4    files likely qualify as trade secrets under California law."  *Loop AI Labs Inc v. Gatti*, 2015 WL

5    1090180, at *3 (N.D. Cal. Mar. 12, 2015).  So too here.

6    UCAR has no evidence of what files it alleges Defendants took, much less that Defendants

7    "retain[ed][the] files", "shared" or used "those files," or that the "unspecified contents of those

8    files likely qualify as trade secrets[.]"  *Loop AI Labs*, 2015 WL 1090180, at *3.  As Judge Gilliam

9    held, "[c]onclusory allegations alone are not sufficient to demonstrate a likelihood of success on

10   the merits."  (*Id.*).  UCAR's preliminary injunction application should be denied.

11                    5.    UCAR's Inevitable Disclosure Theory Has Long Been Rejected

12   Without forensic or other evidence to show Defendants actually misappropriated or

13   threatened to misappropriate UCAR trade secrets, any UCAR misappropriation theory amounts to

14   a long rejected "inevitable disclosure doctrine" theory.[4]  *See Whyte,* 101 Cal.APP.4th at 125.

15   UCAR contends "Defendants cannot separate out UCAR's trade secrets and confidential

16   information[,]" and thus, will misappropriate its trade secrets.  (Dkt. 1 at 48).  This is the precise

17   reasoning rejected by *Whyte*. There, the plaintiff sought a preliminary injunction, prohibiting the

18   defendant from working from a competitor reasoning that "unless the employee has 'an uncanny

19   ability to compartmentalize information' the employee will necessarily rely—consciously or

20   subconsciously—upon knowledge of the former employer's trade secrets in performing his or her

21   new job duties."  *Whyte,* 101 Cal. APP. 4th at 1458–59.  The court rejected such reasoning

22   because such a conclusion "permits an employer to enjoin the former employee without proof of

23   the employee's actual or threatened use of trade secrets based upon an inference (based in turn

24   upon circumstantial evidence) that the employee inevitably will use his or her knowledge of those

25   _____

26   [4]  The "inevitable disclosure" doctrine is also impermissible under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*; that act expressly contains provisions that incorporate state protections on employee mobility.  *See* 18 U.S.C. § 1836 (b)(3)(A)(i) (stating that a court may not issue an injunction based "merely on the information the person knows").  This provision was expressly included to prevent the creation of a federal "inevitable disclosure" doctrine.  *See* S. REP. NO. 114-220, at 8 & n. 16 (2016).

27

28

1 trade secrets in the new employment." *Whyte*, 101 Cal. APP. 4th at 1461–62.

2       Here too, *in lieu* of providing any evidence of actual or threatened misappropriation,

3 UCAR seeks to enjoin Defendants on the theory they cannot "compartmentalize[,]" *e.g.,* "separate

4 out[,] UCAR's trade secrets and confidential information." *Whyte*, 101 Cal. APP. 4th at 1461–62;

5 Dkt. 1 at 48.  The Court should reject UCAR's attempt to "a substitute for proving actual or

6 threatened misappropriation of trade secrets." *Whyte,* 101 Cal.APP.4th at 1464.

7       Even if this legal theory is viable, which it is not, the alleged facts are blatantly false.

8 Defendants applied their technical know-how to UCAR's auto-pilot project, not the other way

9 around.  *E.g.* Li Decl. at ¶7-12, 127.  Outside of this litigation, UCAR recognized Defendants'

10 superior technical skill and knowledge, sending China-based employees to California to receive

11 technical training from Defendants.  *Id.* at ¶21.  This is likely because while at UCAR, Mr. Li used

12 object recognition techniques he learned during his Ph.D. program.  *Id.*at ¶7-12.  Mr. Li's

13 extensive pre-UCAR experience with object detection technology in self-driving vehicles is

14 further evidenced by his patent, which is directed toward the same technology.  *Id.* at ¶11.

15               6.   UCAR Failed to Protect its "Trade Secrets"

16       UCAR is not likely to succeed in establishing that its materials are in-fact trade secrets

17 because it did not take "reasonable efforts to maintain secrecy…include[ing] advising employees

18 of the existence of a trade secret, limiting access to a trade secret on 'need to know basis,' and

19 controlling [physical] access." *Humphreys & Assocs., Inc. v. Cressman*, 2015 WL 12698428, at

20 *4 (C.D. Cal. Aug. 31, 2015) (internal quotations and citations omitted)).  Here, UCAR provides

21 no evidence it did any of these things.  While its Application repeatedly asserts that "the existence

22 of trade secrets are easily identified" and that its materials were "kept confidential[,]" it fails to cite

23 any evidence to support these claims.  Indeed, such general statements fall short of the standard for

24 showing reasonable steps were taken.  *Id.* ("[R]equiring employees to sign confidentiality

25 agreements and limiting access to information…are too general and do not show that [plaintiff]

26 took special care to protect its [materials].").  Lest the Court think UCAR's failure is a mere

27 oversight in citation, as Defendants attest, UCAR simply did not have any formal or informal

28 procedures for identifying or protecting, or keeping secret or confidential any of its materials.

Indeed, UCAR provides no evidence of what steps it actually to identify or guard any of its materials.

(a)   UCAR Did Not Identify Its Materials As Proprietary Or Confidential

Similarly, UCAR does not cite any evidence, nor does it even argue, that it identified materials as proprietary or confidential in the course of business.  During the time of Defendants' employment at UCAR, it did not have any way of identifying its alleged proprietary materials.  Li Decl. at ¶41-50; Zhong Decl. at ¶35-44; Huo Decl. at ¶18-25; Kou Decl. at ¶22-29.  For example, UCAR did not provide Defendants with a handbook or guide informing them which materials were considered proprietary, nor did UCAR mark its materials as proprietary or confidential, making it impossible to identify what materials, if any, UCAR considered proprietary or confidential.  And likewise, UCAR does not contend that internal UCAR documents were not marked as proprietary or confidential.  *Id.*

(b)   There Was Unobstructed Physical Access To UCAR's Office

UCAR did not restrict physical access to its offices.  Although a keycard was required to open the door UCAR's offices, it was common practice for employees to prop open that door during business hours.  *E.g.* Huo Decl. at ¶56.  This practice, which was done nearly very day during Defendants' employment at UCAR, was done in open sight of UCAR's management.  *Id.* Because UCAR did not have an employee handbook or other guidelines prohibiting such a practice, employees were not violating company policy, nor were they directed to stop the practice.  *Id.*

(c)   UCAR's Business Practices Did Not Protect Its AWS Server

While UCAR makes repeated and unsupported accusations about being unable to access its materials on its AWS account, it did little to guard this same access from *other* former employees. A former employee, Bogdan Matican, had the exact same administrative rights to the AWS account after he left UCAR and UCAR did not, to the Defendants' knowledge, change any passwords, ask him to delete his access credentials (which were stored on a computer he took with him), or revoke his access credentials.  Li Decl. at ¶51-69.  In fact, after he left UCAR, Mr.

Matican, using his then-still active access credentials, assisted Mr. Li in gaining administrative

access.  *Id.*.  Much like the unobstructed physical access to UCAR's offices, UCAR's business

practices evidence that it did not take reasonable steps to guard the secrecy of its materials.

(d)    <u>UCAR's Employees Are Not Subject To Confidentiality, Non-</u>
<u>Disclosure, Or Assignment of Rights Agreements</u>

Moreover, UCAR did not protect its information by seeking confidentiality or non-

disclosure agreements from its employees, including Defendants, further evidencing UCAR's

failure to reasonably protect its materials. Li Decl. at ¶¶41-50; Zhong Decl. at ¶¶35-44; Huo Decl. at

¶18-25; Kou Decl. at ¶¶22-29; *see First Health Grp. v. Nat'l Prescription Adm'rs.,* 155 F. Supp. 2d

194 (M.D. Pa. 2001) ("There was no confidentiality agreement between First Health and Paragon

to guard the alleged secrecy of the relationship between the two.")).  Realizing this flaw, UCAR

now contends that Defendants have breached an implied part of their employee agreement, APP.

at 4, and that it has ownership of all of Defendants' technical knowledge.

Not so.  In fact, courts in this district recognize the failure to have such confidentiality

agreements is, in itself, fatal to a plaintiff's ability to establish trade secret status.  *See, e.g.,*

*Teleflora, LLC v. Florists' Transworld Delivery, Inc.,* 2004 WL 1844847 (N.D. Cal. Aug. 18,

2004); *see also Cornewell v. Belton*, No. 3:04-cv-00658-H-BLM at 10 (N.D. Cal. Sept. 9, 2005)

(aff'd *Cornwell v. Belton*, 245 F. App'x 592, 594 (9th Cir. 2007)).  In *Teleflora*, the court expressly

rejected the exact argument that UCAR puts forth.  There, the court concluded that "[the plaintiff]

did not take reasonable measures to ensure the secrecy of its information…[even though the

materials] were allegedly 'treated as confidential' and the 'details were never disclosed to florists,'

[because] [the plaintiff] did not require employees leaving the company to sign non-disclosure

agreements."  *Id.* at *7.  The court rejected plaintiff's "conclusory assertion that [the defendant]

understood that she had obligations to her former employer not to use information ... deemed

confidential." *Id.*; *see also In re Dippin' Dots Patent Litig.*, 249 F. Supp. 2d 1346, 1377 (N.D. Ga.

2003), *aff'd sub nom. Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC*, 369 F.3d 1197 (11th

Cir. 2004) (refusing to imply a confidentially clause "where there was no agreement between the

parties, and where any information that was disclosed contained no indication it was trade

-14-

1  secret…[b]ecause simple measures, such as identifying materials as trade secret and using a

2  written confidentiality agreement, are available to protect sensitive information[.]").

3         7.    <u>UCAR Fails To Identify Any Actual Misappropriation</u>

4       UCAR's trade secret claims are likely to fail because they cannot identify any actual

5  misappropriation.  Instead, UCAR merely makes unsupported allegations that Defendants "took"

6  UCAR's alleged trade secret "out of simple greed."  (APP. at 1, 2, 8).  But UCAR provides the

7  Court with no evidence that Defendants "took" anything that UCAR now contends is a trade

8  secret.  Indeed its baseless accusations, including an alleged "admission" by silence, is not even

9  supported by a single declaration.  (APP. at 2).  In stark contrast, Defendants provide the Court the

10  **only, and unrebutted evidence**—that Defendants have never expressly or impliedly admitted to

11  misappropriating UCAR's materials.  Li Decl. at ¶121-132; Zhong Decl. at ¶92-101; Huo Decl. at

12  ¶59-67; Kou Decl. at ¶63-71.   Likewise deficient is UCAR's allegation that Defendants

13  "destroyed" its alleged trade secrets or interfered with its ability to access materials on AWS.

14         (a)    <u>UCAR's Complete Failure of Proof</u>

15       UCAR's misappropriation allegations must fail because of a complete failure of proof.  For

16  example, despite repeatedly accusing Defendants of taking or stealing its proprietary information,

17  UCAR fails to cite to any documents, logs, or declarations showing that the Defendants

18  inappropriately downloaded or took UCAR's documents, technology, source code, or data.  *See,*

19  *e.g., Loop AI Labs*, 2015 WL 1090180, at *3 (plaintiff failed to offer any actual evidence such as

20  "source code control logs" that would support its allegation).

21       As such, UCAR has failed to identify "specific examples of" purported trade secrets that

22  the Defendants have allegedly inappropriately used.  *Id.*  Indeed, UCAR's "Statement of Facts"

23  has but a single citation to evidence, a declaration stating that UCAR is a China-based ride-hailing

24  service.  (APP. at 2).  The remaining unsupported factual contentions, including allegations that

25  Defendants "[took] UCAR's trade secrets and intellectual property, cop[ied] [the] information to

26  other computers or cop[ied] data to local memory on non-UCAR computers…,and den[ied]

27  UCAR administrative level access to its AWS account[,]" are not the type of "detailed and specific

28  showing courts have found sufficient to support the issuance of a [preliminary injunction]."  *Loop*

1  *AI Labs*, 2015 WL 1090180, at *3.

2        In fact, Defendants *cannot* have engaged in any act of misappropriation, under UCAR's

3  own theory of the case.  Plaintiffs allege that "Defendants have disclosed and intend to continue to

4  disclose UCAR trade secrets and confidential information to others, including their new company,

5  in violation of the CUTSA."  (Dkt. 1 at ¶49).  However, all four of the Defendants can attest that

6  they have not created any workproduct for JingChi corporation yet.  (Li Decl. at ¶88, Zhong Decl.

7  at ¶63-64; 109, Huo Decl. at ¶32; Kou Decl. at ¶42; Han Decl. ¶23) Similarly, UCAR alleges that

8  the Defendants must have already appropriated their trade secrets because "Defendants disclosed

9  trade secret information to third parties to, among other things, entice the third parties to work

10 with Defendants and/or to invest in or set up a new company to compete with UCAR."  However,

11 Defendants Zhong, Hou, and Kou had not agreed to join JingChi until after they resigned from

12 UCAR.  Zhong Decl. at ¶63-64; Hou Decl. at ¶21-32; Kou Decl. at ¶40-42; Han Decl. ¶20-22.

13 ████████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████████

16        Put simply, there is no evidence on which the Court can determine which UCAR entity

17 owned any allegedly confidential information, whether confidential information was improperly

18 access or retained, and thus "[the Court] cannot conclude that [UCAR] likely will prevail on the

19 merits" and UCAR has failed to meet its burden to show that it is likely to succeed on its trade

20 secret claims.  *Stella Sys.,* 2014 WL 11369767, at *4.

21                    (b)      Mere Possession Is Not Misappropriation

22        Even if Defendants had possession of UCAR's trade secrets, which they do not, mere

23 possession does not give rise to misappropriation.  *Be In, Inc. v. Google Inc.*, 2013 WL 5568706,

24 at *3 (N.D. Cal. Oct. 9, 2013).  Indeed, courts in this district recognize that a plaintiff must

25 "show[] [the] improper means" through which the defendant allegedly acquired the alleged trade

26 secret."  *Id.* (granting a motion to dismiss because "misappropriation requires the use of improper

27 means to acquire knowledge of the trade secret.").  In *FLIR*, the appeals court affirmed judgement

28 in favor of former employees accused of trade secret misappropriation, 174 Cal. APP. 4th at 1280

1    (also affirming award of attorney fees), because the former employees' mere possession was not

2    sufficient to prove misappropriation.  *Id.*  There, the court affirmed that the defendant's act of

3    downloading files and bringing it home during his employment was not misappropriation even

4    though the defendant retained possession of the file after employment ended.  *Id.*

5         Here too, UCAR has no evidence of any actual "improper means" through which

6    Defendants allegedly acquired or used UCAR's purported trade secrets.  As in *FLIR,* there is no

7    evidence that any of the Defendants ever accessed Plaintiffs' computer systems after they left

8    UCAR.  Similarly, as in *FLIR,* during the time they were employees, each Defendants' access and

9    use of source code and other UCAR materials was within the scope of their employment.  (Li

10   Decl. at ¶¶145-148, 106, Zhong Decl. at ¶¶102-106, Huo Decl. at ¶¶68-71, and Kou Decl. at ¶¶72-

11   76).  Finally, as was dispositive in *FLIR*, there simply is no evidence that any of the Defendants

12   actually inappropriately obtained or misused any UCAR materials. *Id.*; *FLIR Sys., Inc.*, 174 Cal.

13   APP. 4th at 1295 ("misuse trade secrets, manifested by words or conduct, where the evidence

14   indicates imminent misuse")).  Lest UCAR argue that Defendants' voluntary return of certain

15   UCAR materials indicates misappropriation, the undisputed evidence demonstrates that they (1)

16   obtained these things during the scope of employment and (2) did not access any files after their

17   scope of employment.  Holland Decl. ¶5-8.  For this reason, UCAR's allegations are likely to fail.

18        **B.    UCAR Has Failed to Show It Is Likely to Succeed In Its Contract Claim**

19        To demonstrate its contract claim, UCAR has to show: "(1) the contract, (2) plaintiff's

20   performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages

21   to plaintiff." *Areas USA SJC, LLC v. Mission San Jose Airport, LLC,* 2012 WL 1831576, at *4

22   (N.D. Cal. May 18, 2012) (dismissing contract counterclaims).   UCAR contends it is likely to

23   succeed on its contract claim because Defendants "performed work on the auto-pilot project for

24   the benefit of their own new venture" while employed at UCAR, which UCAR contends violates

25   Cal. Labor Code § 2860.  (APP. at 4).  UCAR is wrong.

26        Again, UCAR fails to cite any evidence to support this bare allegation.  None of the

27   Defendants performed any work for JingChi while with UCAR.  Li Decl. at ¶88, Zhong Decl. at

28   ¶63-64; 109, Huo Decl. at ¶32; Kou Decl. at ¶42; Han Decl. ¶23.  Moreover, even if Defendants

had "performed work on the auto-pilot project for the benefit of their own new venture," which there is no evidence of, UCAR interpretation of § 2860 is directly at odds with Cal. Labor Code § 2870, which makes it against public policy for employers to usurp the work of employees done "entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information[.]"  As courts in this district have recognized, "Labor Code § 2860 does not grant [UCAR] a general property right for non-confidential, non-trade secret employee work product."  *NetApp, Inc. v. Nimble Storage, Inc.*, 2015 WL 400251, at *17 (N.D. Cal. Jan. 29, 2015).  Former employees may use any non-trade secret skills, information, or knowhow that they acquired at their former employer notwithstanding Cal. Labor Code § 2870; where "allegedly taken information is not 'made property by some provision of positive law,' then it 'belongs to no one, and cannot be converted or stolen.'" *Id.*  Thus, UCAR has failed to meet its burden to show that it is likely to succeed in its contract claim.

### C.    UCAR Has Failed to Show It Is Likely to Succeed In Its Property Claim

To demonstrate its property claim, UCAR has to show: "an actual interference with his ownership or right of possession[.]"  *Moore v. The Regents of the Univ. of California*, 51 Cal. 3d 120, 136 (1990).  UCAR's argument that it is likely to succeed in its property claim because Defendants' "destroyed" or are interfering with UCAR's property by formatting their company issued laptops and interfering with UCAR's AWS account (APP. at 5) are false, and lack any support.  Rather, as discussed above in Sections II.C and IV.A.7, Defendants did not destroy any UCAR technical materials and UCAR is in full possession of any materials that were on the laptops.  Likewise, Defendants have not interfered with or nefariously obstructed UCAR's continued use of its own AWS account, nor does UCAR provide any evidence that they have accessed it or downloaded any information from it since their employment ended.  *See* Sections II.C and IV.A.7.  Thus, UCAR has failed to show it is likely to succeed in its property claim.

### D.    UCAR Has Failed to Show It Is Likely to Succeed In Its Fraud Claim

To demonstrate fraud, UCAR has to plead with particularity and show: "(1) a false representation of a material fact, (2) made recklessly or without reasonable ground for believing its truth, (3) with intent to induce reliance thereon, (4) on which the plaintiff justifiably relies, (5)

to his detriment[,]" *Kerr v. Rose*, 216 Cal. App. 3d 1551, 1564–65 (Ct. App. 1990), under state law, or that the defendant "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value." 18 U.S.C. § 1030(a)(4).  UCAR fails to meet the Rule 9 particularity standard.  First, these claims rely on the same unsupported allegations that doomed UCAR's other claims—that Defendants' somehow "destroyed" UCAR's data, are interfering with and accessing UCAR's AWS account, and took UCAR's proprietary information. (APP. at 7-10).  UCAR has no evidence to support these contentions, and UCAR's employees continue to have the ability to upload and download files from UCAR's AWS account.  *See* Sections II.C and IV.A.7.  Moreover, as discussed in Section IV.A.7, UCAR has no evidence to support its allegation that Defendants took or stole its materials.

UCAR's claims under the federal Computer Fraud and Abuse Act (CFAA), must also fail because the **only, and thus unrebutted evidence** before the Court establishes that the Defendants did not access any of UCAR's computers or UCAR's AWS account outside the scope of their authority, making it impossible for UCAR to establish it is likely to succeed in this claim.  *See, e.g., United States v. Nosal*, 844 F.3d 1024, 1038 (9th Cir. 2016) (the CFAA requires establishing that the defendant had actually accessed the system without authorization).

As the Ninth Circuit explained in the seminal *Nosal* decision, "the plain language of the CFAA targets the unauthorized procurement or alteration of information, not its misuse or misappropriation."  *Nosal*, 676 F.3d at 863; *see also Koninklijke Philips N.V. v. Elec-Tech Int'l Co.*, 2015 WL 1289984, at *4 (N.D. Cal. Mar. 20, 2015) (noting there can be no claim under the CFAA against a defendant who downloaded proprietary data "at a time when he was authorized to download this information… [e]ven if he misappropriated the information").  Here, there is no evidence that any of the Defendants ever accessed Plaintiffs' computer systems **after** they left Plaintiffs' employ, which is at least through March 15, 2017.  Li Decl. at ¶¶145-148, 106, Zhong Decl. at ¶¶102-106, Huo Decl. at ¶¶68-71, and Kou Decl. at ¶¶72-76.  Nor is it disputed that during the time they were employees, they had the authority to access source code and other data on UCAR's servers.  (Li Decl. at ¶¶51-69, 106, Zhong Decl. at ¶¶45-56, Huo Decl. at ¶¶26-30,

and Kou Decl. at ¶¶30-34).  And none of the Defendants accessed Plaintiffs' systems after March 14, 2017.  Li Decl. at ¶¶145-148, 106, Zhong Decl. at ¶¶102-106, Huo Decl. at ¶¶68-71, and Kou Decl. at ¶¶72-76.  Accordingly, it is impossible for Defendants to have **procured** any information from Plaintiffs during a period of time when Defendants were not permitted to access that information; and any allegation of subsequent "misuse or misappropriation" is not cognizable under the CFAA.  *Nosal*, 676 F.3d at 863.

Nor can UCAR succeed in its CFAA claim as to Defendants' laptops.  As discussed above, Defendants formatted their laptops on their last day of, *i.e.,* during employment.  UCAR provides no evidence that it had a policy prohibiting this common practice, and as *Nosal* noted, the CFAA's "without authorization" requirement cannot be met by "common practices" lest "million of…citizens would become potential federal criminals overnight."  *Nosal*, 844 F.3d at 1051.

Even if UCAR's CFAA claim were viable, UCAR is unlikely to succeed because it did not require Defendants to sign a confidentiality agreement.  Section I.A.1(d); *Bridal Expo, Inc. v. van Florestein*, 2009 WL 255862, at *11 (S.D. Tex. Feb. 3, 2009) (plaintiffs were unlikely to succeed on their CFAA claim because defendants "had signed no confidentiality agreement … or any other agreement restricting their access to the files they had been working …").

### E.        UCAR's Unfair Competition Claims Have Been Pre-empted And Must Fail

UCAR cannot establish it is likely to succeed in these claims because these causes of action have been pre-empted by the California Uniform Trade Secrets Act.  *Lifeline Food Co. v. Gilman Cheese Corp.*, 2015 WL 2357246, at *1 (N.D. Cal. May 15, 2015) (granting a motion to dismiss unfair competition claims because it "[arose] from the same nucleus of operative facts: [the] alleged use of trade secrets [and] CUTSA therefore preempts [the] unfair competition and conversion claims[.]").  Here too, all of UCAR's unfair competition allegations are based on the "same nucleus of operative facts: the alleged use of trade secrets[,]" and its claims are pre-empted. *Id.*  UCAR cannot show it is likely to succeed on a claim that will be the subject to a successful motion to dismiss.  The unfair competition claims are not superseded, they rely on the same unsupported allegations as its trade secret claims.  (APP. at 9-10).  Thus, for the same reasons as stated above, UCAR has failed to prove it is likely to succeed.

1

## V.     THERE IS NO DANGER OF IRREPARABLE HARM

2

### A.     UCAR Relies on Outdated Law for an Impermissible Presumption of "Irreparable Injury."

3

4
Plaintiffs wrongly claim that "California courts have [] presumed irreparable harm when

5
proprietary information is misappropriated," (Mot. at 10); in fact the exact **opposite** is true.  *E.g.*

6
*GSI Tech.*, 2013 WL 12172990, at *11 ("infringement or misappropriation of proprietary

7
information alone does not create a presumption of irreparable harm").  This disconnect comes

8
from Plaintiffs' sole reliance on outdated law.[5]  In its seminal 2011 decision, *Flexible Lifeline*

9
*Systems, Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 997 (9th Cir. 2011), the Ninth Circuit explained

10
that the Supreme Court's decisions in *eBay Inc. v. MercExchange, L.L.C.* and *Winter v. National*

11
*Resources Defense Council, Inc.*[6] had the effect of overturning prior Ninth Circuit standards that

12
applied a presumption of irreparable harm to the test for a preliminary injunction.  Decisions

13
handed down in this district **after** *Flexible Lifeline* have concluded that a district court may not

14
presume irreparable harm on a motion for preliminary injunction regarding misappropriation of

15
trade secrets.  *E.g. Lilith Games (Shanghai) Co. v. UCool, Inc.*, 2015 WL 5591612, at *2 (N.D.

16
Cal. Sept. 23, 2015);  *GSI*, 2013 WL 12172990, at *11.  Plaintiffs fail to cite a single **post**-*Flexible*

17
*Lifeline* case supporting irreparable harm; their reliance on outdated law dooms their argument.[7]

18
_____

19
[5]     UCAR's reliance on pre-*Flexible Lifeline* cases cannot be excused as merely accidental.

20
Counsel for UCAR, Korula Cherian, was also counsel of record for a defendant in a trade secret
case in which the court, citing *Flexible Lifeline* held that "misappropriation of proprietary
information alone **does not create a presumption of irreparable harm**."  *GSI Tech.*, 2013 WL
12172990, at *11 (citing  *Flexible Lifeline Sys,* 654 F.3d at 994-95) (emphasis added).

21
[6]     *See*  547 U.S. 388 (2006), and 555 U.S. 7 (2008), respectively.

22
[7]     UCAR's cases are also factually distinguishable. There is a sharp break in the case law between
"cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will

23
disseminate those secrets to a wider . . . [and w]here a misappropriator seeks only to use those
secrets . . . in pursuit of profit," and in the later case, "no [] presumption is warranted." *Faiveley*

24
*Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009).  UCAR's argument that
Defendants are motivated by profit distinguishes their cited cases since such a motivation **destroys**

25
any plausible claim of irreparable harm.  *E.g. TMX Funding, Inc. v. Impero Techs., Inc.*, 2010 WL
1028254, at *5 (N.D. Cal. Mar. 18, 2010) (defendants admitted they intended to disclose the

26
information to numerous third parties); *W. Directories, Inc. v. Golden Guide Directories, Inc.*,
2009 WL 1625945, at *6 (N.D. Cal. June 8, 2009) (irreparable harm was the result of disclosing

27
disparaging information to third parties).  In *Allied N. Am. Ins. Brokerage Corp. of California v.*

28
*Woodruff-Sawyer*, 2005 WL 6583937, at (N.D. Cal. Feb. 22, 2005), the court found irreparable
(footnote continued)

**B.     UCAR Has Completely Failed to Demonstrate "Irreparable Injury."**

Unable to rely on a presumption of irreparable harm, UCAR fails meet its burden to "show 'that irreparable injury is likely in the absence of an injunction.'" *M.R. v. Dreyfus,* 697 F.3d 706, 728 (9th Cir. 2012) (quoting *Winter,* 555 U.S. at 22); *Alliance,* 632 F.3d at 1131 (9th Cir. 2011) ("plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction.").  UCAR befalls the very flaw that its counsel successfully argued in the *GSI* case, it fails to identify any actual injury it would suffer if the Court denies its Application, and there is a complete lack of evidence supporting UCAR's contention that its materials are in-fact proprietary, nor is there any evidence that Defendants misappropriated this yet-to-be identified material.   Here too, UCAR has not submitted "a single statement from anyone at [the plaintiff] that [it] will actually be harmed if its purported confidential information is disclosed to competitors, let alone that such harm is irreparable or the threat of such harm is immediate." *GSI Tech.,* No. 5:13-cv-01081-PSG, Dkt. 20 at 12. Indeed, while being "a competitor…may explain why [UCAR] [seeks] [relief], it does not establish [UCAR's] entitlement to it." *Stella Sys.,* 2014 WL 11369767, at *5.

**C.     Any Claimed Injury is Moot.**

Defendants did not remove any of Plaintiffs' property from UCAR's offices when they resigned, and moreover, they have since undertaken a diligent search and returned any and all UCAR property in their possession.[8]  Li Decl. at ¶¶145-148, 106, Zhong Decl. at ¶¶102-106, Huo Decl. at ¶¶68-71, and Kou Decl. at ¶¶72-76.  Accordingly, Defendants no longer have Plaintiffs' property in their possession, and Plaintiffs' request for a preliminary injunction is moot.  *E.g. Funches v. McDaniel*, 2011 WL 1871304, at *4 (D. Nev. Mar. 31, 2011).

---

harm merely "from Defendants' use of confidential information . . . to solicit and/or compete with Allied." *Id* at *14.  But that analysis impermissibly "collapses the likelihood of success and the irreparable harm factors," and is no longer allowed. *Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1251 (9th Cir. 2013)

[8]    Defendants do not concede that they were required to return any of the items that remained in their possession following the termination of their employment. *See, e.g.*, *Stella Sys.,* , 2014 WL 5828315, at *10 (finding that a contractor was not under an obligation to return computers paid for by the moving party, absent a written agreement).

1    **VI.   <u>DEFENDANTS WOULD SUFFER GREATER HARDSHIP</u>**

2           Far from showing it will likely suffer hardship, or that the hardship factor **sharply** weighs

3    in its favor, as required by this Circuit's law, UCAR fails to provide any substantive reason why it

4    would suffer hardship if a preliminary injunction is granted.   While UCAR cites to a case

5    discussing the hardship due to "losing business and being deprived of the benefit of its proprietary

6    information[,]" APP. at 11, UCAR fails to identify any actual benefit it will be deprived of, much

7    less any business it has or will lose if the Court does not enter a preliminary injunction.

8           The cases UCAR cites are not applicable here.   For example, in *Western Directories*, the

9    plaintiff specifically identified its trade secret information—"[the protected] database includes the

10   primary contact at each customer; the pricing, including any discount, for the customer's past

11   contracts with Western Directories' competitors; the customer's payment terms; where and how

12   frequently that customer has published advertisements in the past, including advertisements in

13   other media; the customer's past complaints and requests; and the customer's personal

14   information[,]" allowing the Court could "narrowly tailor[]" a preliminary injunction against the

15   Defendant. *W. Directories, Inc. v. Golden Guide Directories, Inc.*, 2009 WL 1625945, at *5 (N.D.

16   Cal. June 8, 2009).   Not so here, as UCAR alleges that its trade secrets are "data" and "research

17   and development work[,]" APP. at 6, and that it essentially has rights to all of Defendants'

18   technical knowledge.   (*See* Dkt. at ¶ 48; Li Decl. at ¶7-12).   Granting injunctive relief as UCAR

19   suggests would essentially eliminate Defendants' mobility based on nothing more that inferences

20   built on circumstantial evidence, violating California's strong publicly in favor of free mobility.

21   This potential outcome is particularly concerning given UCAR's attempt to conflate GPS "data"

22   collected by 15,000 cars in China, which is **not** used for self-driving cars, with separate data from

23   UCAR's self-driving vehicle project.   (Li Decl. at ¶25, Zhong Decl. at ¶93, Huo Decl. at ¶60).

24          In contrast, Defendants would suffer great harm if the Court were to grant a preliminary

25   injunction.   UCAR has gone to great lengths to follow through on its threat to ruin Defendants'

26   reputation and has issued press releases about this litigation. LaFond Decl. Ex. 4-7.   UCAR would

27   undoubtedly continue it publicity campaign in an attempt to fulfill its threat to damage Defendants'

28   reputations in retaliation for resigning their positions, harming their goodwill, as well as that of

1  their new employer.  *See, e.g., First Franklin Fin. Corp. v. Franklin First Fin., Ltd.*, 356 F. Supp.

2  2d 1048, 1055 (N.D. Cal. 2005) (denying a preliminary injunction because of the defendant's loss

3  of goodwill will cause significant harm).  Moreover, each of the Defendants would not be able to

4  begin or continue their employment with JingChi, resulting in a loss of significant salaries for

5  these four individuals.  The balance of hardships weighs against issuing a preliminary injunction.

6  **VII.    UCAR HAS NO BASIS TO SEEK EXPEDITED DISCOVERY**

7          The Court should likewise reject UCAR's alternative request for expedited discovery

8  because there is no evidence that anything has been or is going to be misappropriated, and UCAR

9  has not provided a particularized identification of the allegedly stolen trade secrets **"before**

10  **commencing discovery** relating to the trade secret[,]" as required by California Civil Procedure

11  Code Section 2019.210[9] and the courts adopting the same.  Cal. Civ. P. Code Section 2019.210

12  (emphasis added); *See, e.g., Soc. Apps, LLC v. Zynga, Inc.*, Case No.: 4:11-CV-04910 YGR (N.D.

13  Cal. Jun. 14, 2012); *Comp. Econ., Inc. v. Gartner Grp., Inc.,* 50 F.Supp.2d 980, 986 (S.D.Cal.

14  May 25, 1999); *Gabriel Technologies Corp. v. Qualcomm Inc.*, 2012 WL 849167 (S.D. Cal.

15  March 13, 2012); *Agency Sols.Com, LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d 1001, 1017 (E.D.

16  Cal. 2011);  *Applied Materials, Inc. v. Advanced Micro-Fabrication Equp. (Shanghai) Co.*, 2008

17  WL 183520, at *1 (N.D. Cal. Jan. 18, 2008).  This requirement, which UCAR fails to address,

18  "assists the court and parties in defining the appropriate scope of discovery…[and] limit[s]

19  [discovery] to those matters that the plaintiff truly contends are secret."  *Soc. Apps,* 2012 WL

20  2203063, at *2.  Without such guidance, plaintiffs like UCAR may abuse the discovery process

21  and improperly "change its claims to conform to the information defendant reveal[s] [during]

22  discovery." *Id.*; *CBS Interactive v. Etilize, Inc.,* 2009 Cal. Super. LEXIS 2262, *11 and*14 (L.A.

23  County Super. Dec. 10, 2009); *Id.* at *14 ("However,…the disclosure [described as] 'Plaintiff's

24  _____

[9]   As Judge Alsup has explained, "[e]xperience has shown that it is easy to allege theft of trade
25  secrets with vagueness, then take discovery into the defendants' files, and then cleverly specify
what ever happens to be there as having been trade secrets stolen from plaintiff." *Jobscience, Inc.*
26  *v. CVPartners, Inc.*, 2014 WL 1724763, at *2 (N.D. Cal. May 1, 2014).  Accordingly, federal
courts have long applied FRCP 16 to require plaintiffs to identify their purported trade secrets
27  before discovery can commence in federal court; this has been required even in jurisdictions where
California law does not apply.  *See, e.g. Vesta Corp. v. Amdocs Mgmt. Ltd.*, 147 F. Supp. 3d 1147,
28  1151 (D. Or. 2015) (collecting cases).

1   DataSource Database,' is too broad and as such is not sufficiently particularized."); *Advanced*

2   *Modular Sputtering, Inc. v. Superior Court*, 132 Cal. APP. 4th 826, 834–35 (2005).

3   **VIII.   ANY PI MUST BE SECURED BY A SUBSTANTIAL BOND**

4          Plaintiffs have engaged in a smear campaign which has already been picked up by the

5   Chinese-language press, *e.g.* LaFond Decl. Ex. 4-7; when Defendants are vindicated, they must be

6   permitted to recover for the harm caused by Plaintiffs to their reputations and livelihood.   A

7   substantial bond must be set to protect Defendants against a wrongful preliminary injunction in

8   this litigation.  *See Lewis Galoob Toys v. Nintendo of Am., Inc.*, 1991 WL 1164068, at *1 (N.D.

9   Cal. Mar. 27, 1991).  When setting a bond, courts will consider both lost income to Defendants

10  and reputational harm.  *See Momento, Inc. v. Seccion Amarilla USA*, 2009 WL 1974798, at *6

11  (N.D. Cal. July 8, 2009).

12         Defendants' annual salary totals with UCAR were a combined ▓▓▓▓▓▓ ▓▓▓▓▓

13  ▓▓▓▓▓▓▓▓▓▓▓▓  If Defendants have an order entered against

14  them in a trade secret misappropriation matter, it is unlikely they will find gainful employment

15  before trial.  In this district the median time to trial is 24.8 months.  LaFond Decl. Ex. 8.

16  Accordingly, Plaintiffs will likely lose a combined ▓▓▓▓▓ if they are wrongfully enjoined.

17         Courts in this district have also recognized that reputational harm in an intellectual

18  property case can be valued at ▓▓▓▓ to the Defendant.  *See CyberMedia, Inc. v. Symantec*

19  *Corp.*, 19 F. Supp. 2d 1070, 1080 (N.D. Cal. 1998).  Here there are four defendants, so an

20  additional $400,000 is required.  The bond should also be increased by an additional $3,500,000 to

21  cover the "cost of litigation," which this district has previously considered when setting a bond.

22  *See Momento*, 2009 WL 1974798, at *6.  This is especially appropriate here because Plaintiffs

23  appear to have pleaded an impermissible "inevitable disclosure" theory, *see supra* §IV(a)(5);

24  entitling Defendants to their attorneys' fees.  *See FLIR,* 174 Cal. APP. 4th at 1277 (defendants

25  entitled to attorneys' fees because pleading inevitable disclosure constitutes bad faith under

26  California law).  Accordingly, the total bond should be ▓▓▓▓▓

27  **IX.   CONCLUSION**

28         The Court should deny UCAR's application for a preliminary injunction.

DEFENDANTS' JOINT OPPOSITION TO MARCH 29. 2017 ORDER TO SHOW CAUSE

1

2

DATED: April 5, 2017

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

3

4

By  */s/ Evette D. Pennypacker*
    Claude M. Stern
    Evette D. Pennypacker
    Kenneth Suh
    Michae F. LaFond
    Sydney Archant
    *Attorneys for Yan Li, Hua Zhong, Da Huo, and*
    *Zhenzhen Kou*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' JOINT OPPOSITION TO MARCH 29, 2017 ORDER TO SHOW CAUSE